**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Western Division**

| | |
|---|---|
| KIOR, INC., | Civil Action No. _____ |
| Plaintiff, | |
| | **COMPLAINT** |
| v. | |
| | **DEMAND FOR JURY TRIAL** |
| GEORGE W. HUBER, | |
| Defendant. | |

**COMPLAINT AND JURY DEMAND**

Plaintiff KiOR, Inc. ("KiOR") complains against Defendant George W. Huber ("Huber"), as follows:

**PARTIES**

1. KiOR is now, and at all times mentioned in this Complaint was, a corporation organized and existing under the laws of the state of Delaware with its principal place of business located in Houston, Texas. KiOR is a corporation engaged in the biofuels industry and is in the business of commercializing catalytic processes for converting biomass to high quality bio-crude.

2. On information and belief, George W. Huber is now, and at all times mentioned in this Complaint was, an individual who resides in Belchertown, Massachusetts. Upon information and belief, Huber is employed as an assistant professor at the University of Massachusetts, Amherst in the Chemical Engineering Department.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over KiOR's claims pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.

4.  Venue is proper in this district under 28 U.S.C. § 1391(a). The Consulting Agreement at issue in this matter was entered into in this district and Defendant resides in this district. Venue is also proper in this district because a substantial part of the events and omissions giving rise to the claim occurred in this district.

## INTRADISTRICT ASSIGNMENT

5.  Pursuant to LR, D. Mass. 40.1(c)(3) and 40.1(d), this action is properly assigned to the Western Division of this Court.

## FACTUAL ALLEGATIONS

6.  Since 2005, KiOR and its predecessor company BIOeCON, have been developing key technologies to improve the conversion of biomass (organic plant matter) for use as an alternative energy source.

7.  One of these key technologies is called "Biomass Catalytic Cracking" (BCC). BCC catalytically converts biomass into a high quality substitute for crude oil, which is then suitable for refining directly to standard transportation fuels. KiOR's BCC technology provides the advantages of using lower temperatures, at lower pressures, in a shorter reaction time, thereby providing a more efficient and lower cost procedure for developing the crude oil substitute.

8.  An important aspect of KiOR's technology is based in a pre-treatment process. This pre-treatment process involves "co-milling" or grinding of the biomass in the presence of

the catalyst, and a procedure known as "torrefaction". KiOR and its predecessor BIOeCON developed and maintained this process as confidential and proprietary information.

      9.      On or about January 1, 2008, KiOR and Huber entered into a Consulting Agreement under which Huber agreed to provide technical consulting and advisory services to KiOR in exchange for certain compensation. A true and correct copy of the January 1, 2008 Consulting Agreement (the "Consulting Agreement") is attached hereto as Exhibit A. The Consulting Agreement includes, *inter alia,* the following provisions:

      i.      **A Non-Competition Provision,** stating:

> You [Huber] agree that during the term of this Agreement, you [Huber] shall not become employed by, advise, or perform consulting services for any entity that is, or, as a result of such activities, would become, a director competitor of the Company [KiOR] in the field of 'Biomass Catalytic Cracking (BCC)' (the "Field") or otherwise would create a conflict of interest for you with your obligations to the Company [KiOR]. Notwithstanding the foregoing, you [Huber] are free to engage in work in the field of BCC, alone or with others, at University of Massachusetts-Amherst, or any other university or academic or research institution, any other non-profit organization, the U.S. government or the European Committee. (*See* Exhibit A at ¶ 2.)

      ii.      **A Confidentiality Provision,** stating:

> You [Huber] agree not to disclose to others any of the Company's [KiOR's] Confidential Information ... The term "Confidential Information" means any confidential information or trade secrets of the Company [KiOR] ... Your [Huber's] obligations of confidentiality under this Agreement will not extend to any information that (a) is known to you at the time of the disclosure from a source other than one having an obligation of confidentiality to the Company [KiOR]; (b) hereafter becomes known to you independently of the disclosure by the Company [KiOR] except from a source having an obligation of non-disclosure to the Company [KiOR]; (c) is or becomes publicly known as by public use or by publication or otherwise ceases to be a secret or confidential through no fault of yours; or (d) is independently developed by you without use of or reference to the Company's [KiOR's] Confidential Information. [¶] **The**

>**confidentiality obligations of this Section shall survive the termination of this Agreement.** (*See* Exhibit A. at ¶ 5; emphasis added.)

10. In the course of his consulting work for KiOR, Huber was given access to confidential and proprietary information developed and/or owned by KiOR which had not been previously disclosed to the public, including that related to KiOR's pre-treatment process for the BCC procedure.

11. On information and belief, during the term of the Consulting Agreement, Huber formed a plan to appropriate KiOR technology, including KiOR's proprietary pre-treatment process, for his personal gain through his relationship with the University of Massachusetts.

12. On or about May 16, 2008, Huber gave notice to KiOR that he was terminating the Consulting Agreement. This termination became effective on August 16, 2008.[1]

13. Huber subsequently founded his own private company, Anellotech, Inc., and incorporated it as a Delaware corporation on November 3, 2008.

14. On March 3, 2009, Huber filed U.S. Patent Application No. 12/397,303, published as US2009/0227823 (the "'303 Patent"), entitled "Catalytic Pyrolysis of Solid Biomass and Related Biofuels, Aromatic, and Olefin Compounds.". The '303 Patent application identifies Huber as the lead inventor and the University of Massachusetts as "assignee." A true and correct copy of the '303 Patent application is attached hereto as Exhibit B.

15. The publication of the '303 Patent application includes a lengthy and substantial description of KiOR's proprietary pre-treatment process.

16. The '303 Patent application claims priority to two provisional applications, Provisional No. 61/068,001 filed March 4, 2008 ("the '001 Provisional") (attached hereto as

---

[1] The Consulting Agreement contains a termination provision which states that the agreement may be terminated unilaterally, with termination becoming effective 90 days after notice.

- 4 -

Exhibit C), and Provisional No. 61/098,284 filed September 19, 2008 ("the '284 Provisional") (attached hereto as Exhibit D). The '284 Provisional provides the same level of disclosure on pretreatment as the '303 Patent application. (*See, e.g.*, Exhibit D at 7-8.)

17. On information and belief, the University of Massachusetts granted an exclusive license to Anellotech, Inc. (the company founded by Huber) for intellectual property rights associated with the '303 Patent.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract—Non-Compete Provision)

18. KiOR hereby incorporates and realleges paragraphs 1-17 above as though set forth fully herein.

19. The Consulting Agreement is a valid and binding contract.

20. KiOR has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Consulting Agreement for the term in which the agreement was in effect.

21. Huber materially breached the Consulting Agreement's non-competition provision by, *inter alia*, (1) planning to and in fact appropriating KiOR technology for his personal gain and/or profit, including KiOR's proprietary pre-treatment process; (2) undertaking efforts to commercialize work based on and/or derived from KiOR technology during the term of the Consulting Agreement; and (3) founding and incorporating a private company (Anellotech, Inc.), for the purposes of obtaining an exclusive license to technology disclosed in the '303 Patent.

22. As a result of Huber's breaches, KiOR has suffered, and will continue to suffer, substantial damages, including, but not limited to, research, development and engineering costs

associated with the development of the technology and lost profits, in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract—Confidentiality Provision)

23.     KiOR hereby incorporates and realleges paragraphs 1-22 above as though set forth fully herein.

24.     The Consulting Agreement is a valid and binding contract.

25.     KiOR has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Consulting Agreement for the term in which the agreement was in effect.

26.     Huber materially breached the Consulting Agreement's confidentiality provision by, *inter alia*, (1) disclosing and/or making publically known KiOR's confidential and proprietary information related to the pre-treatment phase of the technology, as provided in the description of the publication of the '303 Patent application; and (2) disclosing and/or making publically known KiOR's confidential and proprietary information related to the pre-treatment phase of the technology, as provided in the description of the '284 Provisional.

27.     As a result of Huber's breaches, KiOR has suffered, and will continue to suffer, substantial damages, including, but not limited to, research, development and engineering costs associated with the development of the technology and lost profits, in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

28.     KiOR hereby incorporates and realleges paragraphs 1-27 above as though set forth fully herein.

29. The Consulting Agreement is a valid and binding contract.

30. Huber impliedly covenanted to exercise good faith and deal fairly in his performance of the terms of the Consulting Agreement. This obligation included the requirement that Huber "not become employed by, advise, or perform consulting services for any entity that is, or, as a result of such activities, would become, a director competitor of the Company [KiOR, Inc.] in the field of 'Biomass Catalytic Cracking (BCC)' (the "Field") or otherwise would create a conflict of interest for [him] with [his] obligations to the Company [KiOR]."

31. Huber breached the implied covenant of good faith and fair dealing by, among other things, failing to satisfy his obligations described above.

32. Huber engaged in conduct separate and apart from the performance of obligations under the agreement without good faith and for the purpose of depriving KiOR of rights and benefits under the agreement. Specifically, during the term of the Consulting Agreement, Huber formed a plan to appropriate KiOR technology for his personal gain through his relationship with the University of Massachusetts. After undertaking efforts to commercialize work based on and/or derived from KiOR technology during the term of the Consulting Agreement, Huber then founded and incorporated a private company (Anellotech, Inc.), for the purposes of obtaining an exclusive license to technology disclosed in the '303 Patent..

33. KiOR has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Consulting Agreement for the term in which the agreement was in effect.

34. As a result of Huber's breaches, KiOR has suffered, and will continue to suffer, substantial damages, including, but not limited to, research, development and engineering costs

associated with the development of the technology and lost profits, in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**(Fraud and Deceit)**

35. KiOR hereby incorporates and realleges paragraphs 1-34 above as though set forth fully herein.

36. In his communications and actions with KiOR, Huber represented the facts set forth in paragraph 9 as being true, namely, that Huber would "not become employed by, advise, or perform consulting services for any entity that is, or, as a result of such activities, would become, a director competitor of the Company [KiOR, Inc.] in the field of 'Biomass Catalytic Cracking (BCC)' (the "Field") or otherwise would create a conflict of interest for [him] with [his] obligations to the Company [KiOR]."

37. In actuality, Huber's representations were false and were known by Huber to be false at the time he made them.

38. Huber made the representations set forth in paragraph 9 above for the purpose of inducing KiOR to rely upon them. The representations were made with the intent to defraud and deceive KiOR into spending considerable time and money developing the technology.

39. KiOR was unaware of the falsity of Huber's representations, and KiOR acted in justifiable reliance upon Huber's promises and misrepresentations that Huber would "not become employed by, advise, or perform consulting services for any entity that is, or, as a result of such activities, would become, a director competitor of the Company [KiOR, Inc.] in the field of 'Biomass Catalytic Cracking (BCC)' (the "Field") or otherwise would create a conflict of interest for [him] with [his] obligations to the Company [KiOR]." In reliance on Huber's misrepresentations, KiOR spent considerable time and money developing the technology.

40.     During the term of the Consulting Agreement, Huber formed a plan to appropriate KiOR technology for his personal gain through his relationship with the University of Massachusetts. After undertaking efforts to commercialize work based on and/or derived from KiOR technology during the term of the Consulting Agreement, Huber then founded and incorporated a private company (Anellotech, Inc.), for the purposes of obtaining an exclusive license to technology disclosed in the '303 Patent.

41.     If KiOR had known the actual intentions of Huber, KiOR would not have granted Huber access to the KiOR developments.

42.     As a direct and proximate result of Huber's misrepresentations and the facts herein alleged, KiOR has been damaged in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial.

43.     Huber's conduct was intended by Huber to cause injury to KiOR and/or was carried out in conscious disregard of KiOR's rights, and was conducted with the intention to deprive KiOR of property, legal rights and otherwise cause injury, such as to constitute malice. Huber's acts were done knowingly, willfully, and with malicious intent, with a conscious or reckless disregard of KiOR's rights, such that KiOR is entitled to punitive damages in an amount appropriate to punish or set an example of Huber to be determined by proof at trial.

**FIFTH CLAIM FOR RELIEF**
**(Uniform Trade Secrets Act, Civ. Code § 3426, *et seq*.)**

44.     KiOR hereby incorporates and realleges paragraphs 1-43 above as though set forth fully herein.

45.     KiOR's "Biomass Catalytic Cracking" (BCC) technology, and particularly its pre-treatment step, is a trade secret.

46. This trade secret had not been publically disclosed and its trade secret status remained intact prior to Huber's publication of the '303 Patent application.

47. Publication of KiOR's BCC technology, and particularly its pre-treatment step, disclosed the trade secret.

48. Huber acquired this trade secret by improper means. Huber entered into the Consulting Agreement with KiOR and was given access to KiOR's confidential trade secret information. Huber subsequently breached his duty to maintain the secrecy of the KiOR technology as required by the Consulting Agreement's confidentially provision by knowingly including detailed descriptions of the pre-treatment phase in the '303 Patent application and the '284 Provisional—with full knowledge that both would be published to the public, to further his objective of personal gain as described herein.

49. Huber knew at the time of disclosure that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

50. As a result of Huber's breaches, KiOR is entitled to substantial damages, including, but not limited to, recovery for actual loss caused by Huber's misappropriation and for the unjust enrichment realized by Huber, in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial.

51. Huber's misappropriation was intended by Huber to cause injury to KiOR and/or was carried out in conscious disregard of KiOR's rights, and was conducted with the intention to deprive KiOR of property, legal rights and otherwise cause injury, such as to constitute malice. Huber's acts were done knowingly, willfully, and with malicious intent, with a conscious or reckless disregard of KiOR's rights, such that KiOR is entitled to exemplary damages in an amount appropriate to punish or set an example of Huber to be determined by proof at trial.

**PRAYER FOR RELIEF**

WHEREFORE, KiOR prays for judgment against Huber as follows:

a)   That judgment be rendered in favor of KiOR;

b)   That KiOR be awarded general damages according to proof;

c)   That KiOR be awarded specific damages according to proof;

d)   That KiOR be awarded restitution for monies lost;

e)   That KiOR be awarded compensation for Huber's unjust enrichment;

f)   That KiOR be awarded interest on the foregoing as allowed by law;

g)   That KiOR be awarded exemplary and punitive damages in an amount determined to be reasonable;

h)   That KiOR be awarded its costs of suit incurred in bringing this action;

i)   That KiOR be awarded reasonable attorneys' fees according to proof; and

j)   That KiOR be awarded any such other relief as the Court deems just and proper.

**DEMAND**

KiOR demands a trial by jury on all issues so triable.

**KIOR, INC.,**

By its attorneys,

/s/ James. W. Prendergast_____
James W. Prendergast (BBO # 553073)
Manique W. Bloom (BBO # 670537)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617 526-5000
E-mail: james.prendergast@wilmerhale.com
         manique.bloom@wilmerhale.com

**Of Counsel:**

Mark D. Flanagan
Keith L. Slenkovich
Wilmer Cutler Pickering Hale and Dorr LLP
1117 California Avenue
Palo Alto, California 94304
Tel: (650) 858-6000
Fax: (650) 858-6100
E-mail: mark.flanagan@wilmerhale.com
       keith.slenkovich@wilmerhale.com


Dated: December 17, 2009